UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**RAQUEL KEIPER,**

          **Plaintiff,**

          v.                                                  Case No. 24-CV-875

**CNN AMERICA, INC.,**

          **Defendant.**

---

## ORDER

---

**1. Procedural History**

On July 12, 2024, Plaintiff Raquel Keiper filed a complaint against defendant CNN America Inc. (ECF No. 1.) Keiper brings the following claims: Discriminatory Discharge under the Pregnancy Discrimination Act of 1978; Failure to Accommodate and Retaliatory Discharge under the Pregnant Workers Fairness Act (PWFA); and Interference and Retaliation under the Family and Medical Leave Act (FMLA). (ECF No. 1 at 6-11.) On September 13, 2024, CNN filed a motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss Keiper's PWFA claims. (ECF No. 9.)

All parties have consented to the jurisdiction of this Court. (ECF Nos. 3, 5.) The Court has jurisdiction under 28 U.S.C. § 1331. The motion is fully briefed and ready for resolution. (ECF Nos. 10, 11, 14.)

**2. Facts**

The Court accepts the complaint's well-pled allegations as true for purposes of deciding the motion to dismiss and draws all reasonable inferences in Keiper's favor. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016).

Starting January 5, 2022, Keiper worked for CNN as a freelance graphic artist. (ECF No. 1, ¶¶ 11-19.) From May 5, 2022, until the end of her employment in August 2023, she reported directly to Graphic Supervisor Chelsea Torres, who reported to Production Manager Teffari Stewart. (*Id.*, ¶ 20.)

In April 2023 Keiper learned that she was pregnant. (ECF No. 1 at ¶ 22.) She informed Torres of her pregnancy shortly thereafter, and Torres informed Keiper's other supervisors immediately. (*Id.*, ¶¶ 22-23.) One of Keiper's supervisors, Laura Singleton, messaged her to congratulate her, and Keiper announced her pregnancy to her entire team during a zoom call. (*Id.*, ¶ 23.)

On the morning of May 19, 2023, Keiper experienced intense bleeding and believed she was having a miscarriage. (ECF No. 1 at ¶ 24.) She sent a message to Torres to inform her and requested the day off work. (*Id.*) Keiper then went to urgent care that same day. (*Id.*, ¶ 25.)

In the following days Torres and others from Keiper's team checked in to ask about her health and the health of her baby. (ECF No. 1 at ¶ 25.) Keiper explained to Torres that she experienced subchorionic hemorrhaging caused by the pregnancy. (*Id.*, ¶ 26.)

On the morning of July 31, 2023, Keiper had an appointment for a routine ultrasound. (ECF No. ¶ 27.) At that appointment she learned of two potential complications with her pregnancy: the baby had a hypoplastic nasal bone, indicating a heightened risk that her unborn child had Down Syndrome; and her cervical canal appeared to be open and there was a blood clot in her cervix. (*Id.*) Because the medical appointment lasted longer than expected, Keiper contacted Torres to inform her that she would be late for her shift. (ECF No. 1 at ¶ 28.)

Shortly thereafter, in early-to-mid August 2023, Keiper reached out to Alicia Jack to ask about maternity leave. (ECF No. 1 at ¶ 29.) (The complaint does not state who Jack is or what her position is other than to say she was the person who offered Keiper the job at CNN in May 2022.) Jack informed Keiper that she needed to have maternity leave approved by her immediate supervisors. (*Id.*)

On August 18, Keiper contacted Torres and requested two months unpaid maternity leave starting after the birth of her child in December 2023. (ECF No. 1 at ¶¶ 30, 51.) Torres said she would discuss the request with Stewart and get back to her. (*Id.*, ¶ 30.)

3

One week later, on August 25, Stewart informed Keiper that her employment was terminated, effective immediately, and that she was not permitted to return to work. (ECF No. 1 at ¶ 31.) Stewart reassured Keiper that her termination had nothing to do with her job performance and was motivated solely by budgetary concerns. (*Id.*) Keiper was never disciplined by CNN during her employment. (*Id.*, ¶ 32.)

When Keiper applied for unemployment, CNN "tried to prevent Keiper from receiving unemployment benefits by claiming that Keiper was terminated because of performance." (ECF No. 1 at ¶¶ 33-34.)

**3. Motion to Dismiss Standard**

To survive a motion to dismiss under Rule 12(b)(6), "a [complaint] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim satisfies this pleading standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The court accepts "all well-pleaded facts as true and constru[es] all inferences in favor of the plaintiff[]." *Gruber v. Creditors' Prot. Serv.*, 742 F.3d 271, 274 (7th Cir. 2014).

**4. Analysis**

CNN moves to dismiss two of Keiper's claims: (1) failure to accommodate under the PWFA, and (2) retaliatory discharge under the PWFA. (ECF No. 9.)

**4.1 Failure to Accommodate**

The PWFA provides that it is an unlawful employment practice for a covered employer to "not make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 2000gg-1(1). Congress intended the PWFA to expand protections for pregnant employees and modeled it largely off the Americans with Disabilities Act (ADA). *See* Disability Law Compliance Manual § 7A:1; 29 C.F.R. § 1636 app. A—*Interpretive Guidance on the Pregnant Workers Fairness Act*, at ¶ 1; H.R. Rep. No. 117-27, pt. 1, at 12 (2021).

To establish a prima facie case for failure to accommodate under the PWFA, Keiper must allege facts sufficient to show: (1) she is a qualified individual; (2) the employer was aware of her limitation; and (3) the employer failed to reasonably accommodate the limitation. 42 U.S.C. § 2000gg-1(1); *see also Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (stating elements of ADA claim).

### 4.1.1 Qualified Employee

An individual is a qualified employee under the PWFA if they "can perform the essential functions of the employment position," even if they are temporarily unable to do so. 42 U.S.C. § 2000gg(6). CNN does not dispute that Keiper is a qualified employee. (ECF No. 10.) Moreover, Keiper's allegations that she worked at CNN for over a year and a half without any performance issues (ECF No. 1 at ¶¶ 11, 21, 32) and that she was pregnant and experienced medical complications (*Id.*, ¶¶ 22-30) sufficiently allege she was a qualified employee.

### 4.1.2 Known Limitation

Employers only face liability under the PWFA for failure to accommodate their employee's *known* limitations. 42 U.S.C. § 2000gg-1(1). "[T]he term 'known limitation' means physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions that the employee or employee's representative has communicated to the employer whether or not such condition meets the definition of disability specified in … the [ADA][.]" 42 U.S.C. § 2000gg(4). "Communicated to the employer" includes "ma[king] the employer aware of the limitation by communicating with a supervisor, a manager, someone who has supervisory authority for the employee or who regularly directs the employee's tasks …." 29 C.F.R. § 1636.3(d).

The Equal Employment Opportunity Commission (EEOC) regulations explain that "[k]nown, in terms of limitation, means the employee or the employee's

representative has communicated the limitation to the employer." 29 C.F.R. § 1636.3(a)(1). "The communication may be made orally, in writing, or by another effective means" and "need not be in writing, be in a specific format, use specific words, or be on a specific form in order for it to be considered 'communicated to the employer.'" 29 C.F.R. § 1636.3(d)(1)-(2).

The EEOC interpretive guidance further states that, to request an accommodation, "the employee … must communicate to the employer that they need an adjustment or change at work due to their known limitation." 29 C.F.R. § 1636 app. A, at ¶ 56. In each of the EEOC's examples of reasonable accommodation requests under the PWFA the employee communicates their limitation and need for an accommodation at the same time, and "[t]he Commission expects that in the vast majority of cases these two communications will happen at the same time." 29 C.F.R. § 1636 app. A, at ¶ 57; *see also id.* at ¶ 24 ("In practice, the Commission expects that these actions—communicating the limitation to the employer and requesting a reasonable accommodation—*will* take place at the same time." (emphasis added)).

Once the employee satisfies the initial duty of informing the employer of their limitation and desire for an accommodation, the employee and employer must work together through an "interactive process" to determine what, if any, accommodation is reasonable. *See E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 804-04 (7th Cir. 2005) (describing interactive process under the ADA); *see also* 29 C.F.R. § 1636 app. A, at ¶ 105

("[The PWFA] largely adopts the explanation of the interactive process in the regulation implementing the ADA."); *compare* 29 C.F.R. § 1636.3(k) (PWFA), *with* 29 C.F.R. § 1630.2(o)(3) (ADA). "Th[e] [interactive] process should identify the known limitation under the PWFA and the adjustment or change at work that is needed due to the limitation, if either of these is not clear from the request, and potential reasonable accommodations." 29 C.F.R. § 1636.3(k).

"Where notice is ambiguous as to the precise nature of the [employee's] disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification." *Sears, Roebuck & Co.*, 417 F.3d at 804. "[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's request for assistance, or by intentionally remaining in the dark." *Id.*

CNN argues that Keiper does not state a claim for failure to accommodate under the PWFA because her allegations reveal "she did not ever communicate to her manager, at any point in time, that her request for unpaid maternity leave was in any way connected to any known limitation or related medical condition." (ECF No. 14 at 3.)

Keiper contends that her allegation that she told Torres she had experienced subchorionic hemorrhaging communicated a known limitation that triggered the interactive process "in lieu of terminating [her] employment." (ECF No. 11 at 4-8.)

The complaint alleges that on the morning of May 19, 2023, Keiper "experienced intense bleeding" and that a trip to urgent care revealed "she had experienced subchorionic hemorrhaging caused by the pregnancy." (ECF No. 1 at ¶¶ 24-26.) While the complaint alleges Keiper told her supervisor, Torres, about the bleeding, the only accommodation requested was the day off work. (*Id.*, ¶¶ 24-25.) There is no allegation in the complaint that Torres failed to grant this request.

The complaint alleges two other pregnancy-related complications: on July 31 Keiper learned that her unborn child had a hypoplastic nasal bone, indicating a heightened risk that the child had Down Syndrome, and also that her cervical canal appeared to be open with a blood clot in her cervix. (ECF No. 4, ¶ 27.) The complaint links these pregnancy complications to Keiper's accommodation request for two months unpaid leave once the baby is born: "Keiper requested … maternity leave due at least in part to her pregnancy-related medical complications and the possibility that her child would have special needs." (ECF No. 1 at ¶ 49.) However, the complaint does not allege that Keiper ever communicated these pregnancy-related complications to her employer.

The only relevant basis for Keiper's claim that CNN failed to "provide a reasonable accommodation to [her] known limitation related to pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000gg-1(1), is that she experienced subchorionic hemorrhaging on May 19 and, on August 18, requested two months of

unpaid maternity leave after the birth of her child in December. But nothing in the complaint connects Keiper's hemorrhaging to her alleged accommodation request.

In fact, nothing in Keiper's maternity leave request signaled it was *due to* any limitation. 29 C.F.R. § 1636 app. A, at ¶ 56; *c.f. id.* at ¶ 57 (listing examples of reasonable accommodation requests, such as "I'm having trouble getting to work at my scheduled starting time because of morning sickness" and "[a]n employee tells a supervisor that she needs time off *to recover from* childbirth" (emphasis added)). There was nothing to put CNN on notice that the request for two months maternity leave was anything other than a standard request for time to bond with and care for the child. 29 C.F.R. § 1636 app. A, at ¶ 6 ("Time for bonding or time for childcare … is not covered by the PWFA."). CNN had no reason to suspect that hemorrhaging early in Keiper's pregnancy indicated a need for an accommodation after the birth of the child seven months later. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001) (analyzing failure to accommodate under the ADA and stating that an "employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace" and the alleged limitation was "episodic, not continual").

Because the complaint does not allege a communicated limitation and a related, unaccommodated request, CNN's duty to engage in the interactive process regarding

maternity leave was never triggered, *see Sears, Roebuck & Co.*, 417 F.3d at 803, and its termination of Keiper did not violate the PWFA.

While the complaint's allegations may raise claims for violations under other laws (which Keiper raises and which CNN does not challenge in the present motion), it does not state a claim under the PWFA for CNN's failure to accommodate a known limitation. Accordingly, CNN's motion to dismiss Keiper's failure to accommodate claim under the PWFA will be granted.

### 4.2 Retaliatory Discharge

The PWFA protects employees from suffering retaliation for asserting their PWFA rights. 42 U.S.C. § 2000gg-1(5). To state a retaliatory discharge claim under the PWFA, Keiper must allege facts sufficient to show her employer took an adverse employment action against her because of her statutorily protected activity. While Keiper alleges she suffered an adverse employment action—termination (ECF No. 1 at ¶ 51)—her retaliatory discharge claim fails for the same reasons as her failure to accommodate claim: Keiper does not sufficiently allege that CNN failed to accommodate a *known* limitation. Thus, CNN's motion to dismiss Keiper's retaliatory discharge claim under the PWFA will be granted.

**5. Conclusion**

For the reasons set forth above,

**IT IS THEREFORE ORDERED** that the Defendant's motion for partial dismissal (ECF No. 9) is **granted**. Keiper's claims for retaliatory discharge under the PWFA (Count II) and failure to accommodate under the PWFA (Count III) are dismissed. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 16th day of December, 2024.

_WILLIAM E. DUFFIN_
U.S. Magistrate Judge